# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| MICHELE WHITE, surviving spouse of TONY WHITE,<br><br>      Petitioner,<br><br>      vs.<br><br>CAROLYN W. COLVIN, Acting Commissioner of Social Security<br><br>      Respondent. | Case No.:3:16-cv-00071-REB<br><br>**MEMORANDUM DECISION AND ORDER** |

Pending before this Court is Petitioner Michele White's (the surviving spouse of Tony White) Petition for Review, seeking review of the Social Security Administration's final decision to deny Mr. White's claim for Title II Social Security disability benefits and Title XVI Supplemental Security Income benefits. *See generally* Pet. for Review (Docket No. 1). This action is brought pursuant to 42 U.S.C. § 405(g). Having carefully considered the record and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. ADMINISTRATIVE PROCEEDINGS

On January 27, 2012, Tony White filed his application for Disability Income Benefits; and, on February 14, 2012, protectively filed for Supplemental Security Income – in both applications, Mr. White alleged disability beginning January 15, 2012. The claims were initially denied on March 13, 2012 and, again, on reconsideration on July 17, 2012. On July 27, 2012, Mr. White timely filed a Request for Hearing before an Administrative Law Judge ("ALJ"). On August 6, 2013, ALJ Doug Gabbard, II held a video hearing (from McAlester, Oklahoma), at which time Mr. White, represented by attorney Jonathan Heeps, appeared and testified from

**MEMORANDUM DECISION AND ORDER - 1**

Paris, Texas. Impartial vocational expert, Bonnie M. Ward, also appeared and testified during the same August 6, 2013 hearing.

On October 30, 2013, the ALJ issued a Decision denying Mr. White's claim, finding that he was not disabled within the meaning of the Social Security Act. Mr. White timely requested review from the Appeals Council on December 23, 2013. Mr. White passed away on April 23, 2014. On January 20, 2015, the Appeals Council denied Mr. White's Request for Review, making the ALJ's Decision the final decision of the Commissioner of Social Security.

Having exhausted her administrative remedies, Petitioner (Mr. White's surviving spouse) timely filed the instant action, arguing that "[t]he final Agency decision is not supported by substantial competent evidence and/or contains legal error." Pet. for Review, p. 1 (Docket No. 1). In particular, Petitioner contends that (1) the ALJ did not give legally sufficient reasons for rejecting the treating cardiologist's opinion about Mr. White's ability to sustain work activity; (2) the ALJ did not provide clear and convincing reasons for finding Mr. White not credible; and (3) the ALJ failed to evaluate the relevant medical evidence before concluding that Mr. White's impairments did not meet or equal a listed impairment. *See generally* Pet.'s Brief (Docket No. 15). Petitioner therefore requests that the Court either reverse the ALJ's Decision and find that Mr. White had been entitled to disability benefits, or, alternatively, remand the case for further proceedings and award attorneys' fees. *See* Pet. for Review, p. 2 (Docket No. 1).

## II. STANDARD OF REVIEW

To be upheld, the Commissioner's decision must be supported by substantial evidence and based on proper legal standards. *See* 42 U.S.C. § 405(g); *Matney ex. rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990). Findings as to any question of fact, if supported by substantial evidence, are conclusive. *See* 42

U.S.C. § 405(g). In other words, if there is substantial evidence to support the ALJ's factual decisions, they must be upheld, even when there is conflicting evidence. *See Hall v. Sec'y of Health, Educ. & Welfare*, 602 F.2d 1372, 1374 (9th Cir. 1979).

"Substantial evidence" is defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Tylitzki v. Shalala*, 999 F.2d 1411, 1413 (9th Cir. 1993); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The standard requires more than a scintilla but less than a preponderance (*see Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975); *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989)), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

With respect to questions of fact, the role of the Court is to review the record as a whole to determine whether it contains evidence that would allow a reasonable mind to accept the conclusions of the ALJ. *See Richardson*, 402 U.S. at 401; *see also Matney*, 981 F.2d at 1019. The ALJ is responsible for determining credibility and resolving conflicts in medical testimony (*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)), resolving ambiguities (*see Vincent ex. rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984)), and drawing inferences logically flowing from the evidence (*see Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982)). Where the evidence is susceptible to more than one rational interpretation, the reviewing court may not substitute its judgment or interpretation of the record for that of the ALJ. *See Flaten*, 44 F.3d at 1457; *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

With respect to questions of law, the ALJ's decision must be based on proper legal standards and will be reversed for legal error. *See Matney*, 981 F.2d at 1019. The ALJ's

construction of the Social Security Act is entitled to deference if it has a reasonable basis in law. *See id.* However, reviewing federal courts "will not rubber-stamp an administrative decision that is inconsistent with the statutory mandate or that frustrates the congressional purpose underlying the statute." *See Smith v. Heckler*, 820 F.2d 1093, 1094 (9th Cir. 1987).

## II. DISCUSSION

### A. Sequential Process

In evaluating the evidence presented at an administrative hearing, the ALJ must follow a sequential process in determining whether a person is disabled in general (*see* 20 C.F.R. §§ 404.1520, 416.920) – or continues to be disabled (*see* 20 C.F.R. §§ 404.1594, 416.994) – within the meaning of the Social Security Act.

The first step requires the ALJ to determine whether the claimant is engaged in substantial gainful activity ("SGA"). *See* 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). SGA is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities. *See* 20 C.F.R. §§ 404.1572(a), 416.972(a). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized. *See* 20 C.F.R. §§ 404.1572(b), 416.972(b). If the claimant has engaged in SGA, disability benefits are denied, regardless of how severe his physical/mental impairments are and regardless of his age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not engaged in SGA, the analysis proceeds to the second step. Here, the ALJ found that Mr. White had not engaged in substantial gainful activity since January 15, 2012, the alleged onset date. *See* (AR 24).

The second step requires the ALJ to determine whether the claimant has a medically determinable impairment, or combination of impairments, that is severe and meets the duration

requirement. *See* 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment or combination of impairments is "severe" within the meaning of the Social Security Act if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. *See* 20 C.F.R. §§ 404.1521, 416.921. If the claimant does not have a severe medically determinable impairment or combination of impairments, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c). Here, the ALJ found that Mr. White had the following severe impairments: "atherosclerotic heart disease, hypertension, status post coronary artery bypass graft with pacemaker implantation, major depressive disorder, generalized anxiety disorder, relational problems NOS, [and] personality disorder NOS." *See* (AR 24-26).

The third step requires the ALJ to determine the medical severity of any impairments; that is, whether the claimant's impairments meet or equal a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the answer is yes, the claimant is considered disabled under the Social Security Act and benefits are awarded. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant's impairments neither meet nor equal one of the listed impairments, the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See id.* Here, the ALJ concluded that Mr. White's above-listed impairments, while severe, did not meet or medically equal, either singly or in combination, the criteria established for any of the qualifying impairments. *See* (AR 28-30).

The fourth step of the evaluation process requires the ALJ to determine whether the claimant's residual functional capacity ("RFC") is sufficient for the claimant to perform past

relevant work.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments.  *See* 20 C.F.R. §§ 404.1545, 416.945.  Likewise, an individual's past relevant work is work performed within the last 15 years or 15 years prior to the date that disability must be established; also, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), 416.965.  Here, the ALJ determined:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and/or carry 20 pounds occasionally, and 10 pounds frequently; to stand and/or walk about six hours total during an eight hour work day; and to sit for about six hours total during an eight hour work day.  He must be allowed to alternately sit and stand every 60 minutes throughout the workday in order to change positions but without leaving the workstation.  He can perform semi-skilled work (work which requires some detailed skills, but does not require doing more complex work duties) where interpersonal contact with supervisors and coworkers is on a superficial work basis, and he will have only occasional contact with the general public.  In other words, he can perform less than the full range of "light" work.

*See* (AR 27-39) (citing 20 C.F.R. 404.1567(b), 416.967(b)).

In the fifth and final step, if it has been established that a claimant can no longer perform past relevant work because of his impairments, the burden shifts to the Commissioner to show that the claimant retains the ability to do alternate work and to demonstrate that such alternate work exists in significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v), 404.1520(f), 416.920(f); *see also Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993).  If the claimant is able to do other work, he is not disabled; if the claimant is not able to do other work and meets the duration requirement, he is disabled.  Here, the ALJ found that Mr. White was unable to perform any past relevant work.  *See* (AR 39).  However, the ALJ

**MEMORANDUM DECISION AND ORDER - 6**

further found that there are jobs that exist in significant numbers in the national economy that Mr. White could perform, including small product assembler and electric assembler. *See* (AR 39-40). Therefore, based on his age, education, work experience, and RFC, the ALJ concluded that Mr. White "ha[d] not been under a disability, as defined in the Social Security Act, from January 15, 2012, through the date of this decision." (AR 40).

**B.     Analysis**

1.     The ALJ Properly Considered Dr. Hashmi's Opinions

The medical opinion of a treating physician is entitled to special consideration and weight. *See Rodriguez v. Bowen*, 876 F.2d 759, 761 (9th Cir. 1989). Such deference is warranted because the treating physician "is employed to cure and has a greater opportunity to know and observe the individual." *Id*. Even so, a treating physician's opinion is not necessarily conclusive. *See id*. at 762. But, if the treating physician's opinions are not contradicted by another doctor, they may be rejected only for clear and convincing reasons. *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Further, even if the treating physician's opinions are contradicted by another doctor, they can be rejected only if the ALJ provides specific and legitimate reasons supported by substantial evidence in the record. *See id*. A lack of objective medical findings, treatment notes, and rationale to support a treating physician's opinions is a sufficient reason for rejecting that opinion. *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

Here, Petitioner contends that the ALJ failed to give proper weight to Dr. Hashmi's "sustainability opinion," as reflected within his July 2, 2012 responses to "Interrogatories to Treating Physician." *See* Pet.'s Brief, pp. 12-16 (Docket No. 15) (citing (AR 403-07)). Therein, Dr. Hashmi stated that:

- Mr. White had congestive heart failure, Type II diabetes mellitus, coronary artery disease, cardiomyopathy, hypertension, hyperlipidemia, and prior coronary artery bypass grafting;

- Mr. White's ischemic cardiomyopathy and congestive heart failure could cause fatigue;

- Mr. White would often need to rest for extended periods of time during an eight-hour day;

- Given Mr. White's medical conditions, Mr. White was unable to perform work activities at a sedentary level on a sustained basis without special consideration or accommodation by an employer;

- Mr. White's condition lasted or was expected to last for at least 12 months; and

- Mr. White could not work.

(AR 404-07). The ALJ acknowledged these opinions, but ultimately gave them "little weight" which, by virtue of this action, Petitioner now disputes. (AR 36). According to Petitioner:

> The ALJ gave one reason for rejecting [Dr. Hashmi's] opinion: "the medical evidence does not support the degree of limitation [Mr. White] alleges, and his report of [Mr. White's] limitations is inconsistent with what [Mr. White] reported he can do despite his impairments." That one reason is not legally sufficient: it is not a clear and convincing reason, a specific and legitimate reason, or a good reason.

Pet.'s Brief, p. 14 (Docket No. 15) (quoting (AR 36)). For the reasons stated below, the undersigned disagrees.

To begin, it is not altogether accurate to characterize – as Petitioner attempts to do here – the ALJ's rejection of Dr. Hashmi's opinions as being supported by a conclusory, single reason. The ALJ dedicated a significant portion of the Decision to Dr. Hashmi's opinions and, relatedly, provided his *reasons* (drawn from the medical evidence) for not adopting them *in toto* when discussing Mr. White's RFC. *See, e.g.*, (AR 36) ("For all of these reasons, I give Dr. Hashmi's opinion little weight. Though he is a specialist who has a treating relationship with [Mr. White],

**MEMORANDUM DECISION AND ORDER - 8**

the medical evidence does not support the degree of limitation he alleges, and his report of [Mr. White's] limitations is inconsistent with what [Mr. White] reported he can do despite his impairments.").

Next, addressing the ALJ's proffered reasons, the Court notes that they were presented in response to Mr. White's post-hearing/pre-Decision argument that the opinions of State Agency reviewing physician, Randal Reid, M.D., (secured after the August 6, 2013 hearing via interrogatories) should be given no weight, while Dr. Hashmi's opinions should be given controlling weight. *See* (AR 33-34) ("However, in this instance, the representative has had ample opportunity to 'discuss the matter in more detail' in his correspondence, and has cogently stated his reasoning why Dr. Reid's opinion should be given no weight, and Dr. Hashmi's opinion should be given controlling weight."). In largely rejecting these arguments, the ALJ observed:

- Dr. Hashmi's treatment notes often contained "predominantly-normal-limits findings" and repeatedly noted that Mr. White is on "stable dosages of medications." *See* (AR 29-31, 35) (citing (AR 369, 372-73, 394-99, 436-39, 685-87)).

- Despite Dr. Hashmi stating in his July 2, 2012 interrogatory responses that Mr. White could not work at all, his treatment notes "reflect that he imposed no activity limitations or restrictions on [Mr. White]." (AR 35). In fact, throughout the record, Dr. Hashmi not only recommended that Mr. White exercise, Mr. White indicated that he had been compliant with the recommended exercise. *See* (AR 356, 372, 394, 397, 436, 439). Similarly, Dr. Hashmi's statement concerning Mr. White's (in)ability to work contrast with certain of Mr. White's activities of daily living – in particular, working on old cars and cleaning the house. *See* (AR 35-36); *see also infra*.

- Though Dr. Hashmi indicated that Mr. White could not work and was unable to perform work activities at a sedentary level, he had earlier stated only that it was reasonable that Mr. White's conditions could produce the alleged symptoms – not that Mr. White actually had such symptoms. *See* (AR 35)

(citing (AR 404) ("The ischemic cardiomyopathy and [congestive heart failure] *can* cause fatigue.") (emphasis added)). However, Mr. White frequently denied having fatigue when he saw Dr. Hashmi. *See* (AR 35) (citing (AR 395, 398, 437, 440, 686)). Moreover, in July 2013, Dr. Hashmi found that Mr. White had no active congestive heart failure (but still had cardiomyopathy and an ejection fraction of about 40%). *See* (AR 31, 35) (citing (AR 686)).

Finally, Dr. Hashmi's opinions (at least the ones drawn from his July 2, 2012 responses to "Interrogatories to Treating Physician") do not exist in isolation. For example, on March 12, 2012, the reviewing physician, Dr. Reid, opined in a "Physical Residual Functional Capacity Assessment" ("Assessment") that Mr. White could perform a range of light work with standing and/or walking no more than two to three hours in an eight-hour workday. *See* (AR 345-51). Dr. Reid's opinions were then echoed at the reconsideration level by Tina Ward, M.D., on July 16, 2012. *See* (AR 410-12). Though only giving Dr. Reid's ultimate opinions "some weight," the ALJ nonetheless pointed out that his Assessment was based on Mr. White's findings at baseline after inpatient hospitalization, stating: ". . . this is predominately consistent with what the medical evidence shows – that [Mr. White] has required some treatment, after which he is stabilized and is within normal limits following treatment." (AR 36).[1] Hence, the ALJ concluded:

> Both the diagnostic studies and the reports of his treatment providers show that [Mr. White] was consistently stabilized and improved, if not completely resolved, at the time of discharge. Not only did he then report feeling fairly well overall, but he was also within normal limits on examination. It is true that [Mr. White] has severe heart-related impairments. However, there is no indication that such impairments at baseline render him incapable of working, and no indication that his medical condition on admission for any of the [five, earlier-discussed hospitalizations] would be expected to last for at least 12 months. *No treating or examining physician has explicitly stated that [Mr. White's] condition at baseline is such that he would reasonably be expected to periodically deteriorate, only to stabilize with inpatient*

---

[1] The ALJ agreed with Dr. Reid's opinion that Mr. White could perform light work, but disagreed with the additional limitation regarding standing and/or walking. *See* (AR 37).

> *intervention.* Rather, as noted above, differing causes and diagnoses were given for the reported symptoms, including, on at least one occasion, medication noncompliance on the report of [Mr. White]. *Due to [a] lack of such treating or examining physician statement, no reasonable inference may be drawn that such would be the case, and it is instead appropriate to look to his follow-up treating notes to assess the claimant's condition at baseline.*

(AR 37) (emphasis added). In short, according to the ALJ, Dr. Hashmi's view that Mr. White could not work does not align with the balance of the medical record, including Dr. Hashmi's own historical treatment notes.

This summary is not intended to challenge the fact that Mr. White had a multitude of issues surrounding his heart-related impairments; rather, the focus is upon the lack of corroboration in the medical record (including Dr. Hashmi's treatment notes themselves) to the substantial limitations provided in Dr. Hashmi's July 2, 2012 responses to "Interrogatories to Treating Physician." This is what the ALJ meant when stating that "the medical evidence does not support the degree of limitation [Dr. Hashmi] alleges . . . ." (AR 36). The undersigned agrees, finding that the ALJ provided clear and convincing reasons for rejecting Dr. Hashmi's opinions.[2] This is not to say that this Court concludes that Mr. White was not disabled under the applicable rules and regulations; to be sure, Petitioner appropriately identifies conflicting evidence in support of the position that he was so disabled.[3] While such conflicting evidence

---

[2] Petitioner misses the point when arguing that (1) "there is no evidence that the ALJ had any medical understanding of chronic heart failure," and (2) "[t]he ALJ cited no medical evidence or authority that an individual with baseline chronic heart failure is capable of work on a sustained basis." Pet.'s Brief, p. 15 (Docket No. 15). To be clear, it is Petitioner's burden of showing disability and presenting medical evidence in support of this claim. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). Additionally, the ALJ need only point to clear and convincing and/or specific and legitimate reasons for questioning Dr. Hashmi's opinions.

[3] On this point, the ALJ stated: "This picking and choosing of evidence to advance [Mr. White's] argument does not reflect well on the credibility of the representative and could

may not have been as favorably received as Petitioner naturally hoped, the ALJ's decision to question Dr. Hashmi's disability opinion contains appropriate reasons for doing so. As required by controlling law, the ALJ will not be second-guessed in this respect. *See Batson v. Comm'r of Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.") (internal citations omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

2.     Mr. White's Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). Where, as here, Mr. White presented evidence of an underlying impairment and the government does not argue that there is evidence of malingering, the Court reviews the ALJ's rejection of his testimony for specific, clear and convincing reasons. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). As the Ninth Circuit has recognized, this is not an easy requirement to meet because "the clear and convincing standard is the most demanding required in Social Security cases." *Garrison v.*

---

reasonably be seen as suggestive of lack of candor before the tribunal." (AR 35); *see also id.* (further noting Mr. White's representative's "questionable credibility" vis à vis Dr. Reid's hospital privileges and home address as primary practice address: "Given that the representative is an attorney at law, with roughly analogous requirements to complete yearly continuing education courses as that of an M.D., and that the Texas Medical Board website shows Dr. Reid is currently licensed, I find this wholly unnecessary and unwarranted character assault on Dr. Reid gravely disingenuous at best.").

**MEMORANDUM DECISION AND ORDER - 12**

*Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014). However, "the ALJ is not required to believe every allegation of disabling pain," otherwise disability benefits "would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Molina*, 674 F.3d at 1112.

In evaluating credibility, the ALJ may engage in "ordinary techniques of credibility evaluation." *Id.* An ALJ may consider: (1) inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) whether the claimant engages in daily activities inconsistent with the alleged symptoms; (4) the observations of treating and examining physicians and other third parties regarding the claimant's symptoms; and (5) functional restrictions caused by the symptoms. *See id.*

A finding that testimony is not credible "must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991)). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Brown-Hunter*, 806 F.3d at 493. Although it need not be extensive, the ALJ must provide some reasoning" that will allow a reviewing court "to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence." *Id.* at 495.

Petitioner claims that, at all relevant times, Mr. White was disabled, largely owing to his heart-related impairments. *See generally* Pet. for Review (Docket No. 1); Pet.'s Brief (Docket

**MEMORANDUM DECISION AND ORDER - 13**

No. 15).  As to that subject, Mr. White answered questions from both the ALJ and his attorney at

the August 6, 2013 hearing:

> Q:     Okay.  Tell me why you believe you can't work at a full-time job anymore.

> A:     I get short of breath real easy.  I get tired easy.  I have problem with angina
> with pain, you know, in my arms and stuff when I do a lot.

> Q:     Okay.  Now, you had – didn't you have three heart attacks at one point or –

> A:     Yes, sir.  I've had three heart attacks, triple bypass.  I got a pace maker and
> defibrillator, too.

> Q:     Okay.  You had those back in 2009?

> A:     I think that was the last one.  Yes, sir.

> Q:     Okay.  And since that time, what kind of problems, if any, have you had?

> A:     Just tired all the time.

> Q:     Okay.  Okay.  As far as lifting stuff, what do you feel like you're comfortable
> lifting?

> A:     I'm not really weak like that.  I mean, I just don't have any –

> Q:     They – one of the doctors –

> A:     I [just] can't do anything very long.

> Q:     One of the doctors that looked over your file, the doctor that Mr. Heeps has
> objected to [(Dr. Reid)], has rated you for light work, which is not very much
> lifting.  It's basically, like, two gallons of milk.

> A:     Yeah.

> Q:     Up to two gallons of milk.  Can you lift two gallons of milk?

> A:     Yeah, I can do that.

> Q:     Could you lift one gallon fairly frequently?

> A:     I couldn't do it very long.  I would run out of –

**MEMORANDUM DECISION AND ORDER - 14**

Q:      Well, I don't mean holding it for a long time.  I just mean lifting it for a long time – or lifting it.

A:      No, sir.  I don't think I could.

Q:      Okay.  Not even one gallon?

A:      No, sir.

Q:      Okay.  Why not?

A:      I just get fatigued real easy.

Q:      What do you feel – what kind of pounds do you feel like you could lift frequently?

A:      I really don't know about that.  I mean, I would be – I mean, four or five, I guess.

Q:      Four or five pounds?  And occasionally, what do you think you could lift?

A:      Thirty to 40.

Q:      Okay.  How do you spend a day?  I mean, what do you do during the day to take up your time?

A:      Read.

Q:      Okay.  And what kind of novels do you like?

A:      Anything.  I'm not particular.

Q:      So, do you spend most of the day sitting down or standing up or –

A:      Sitting down.

Q:      – I guess you sit down, don't you –

A:      Yes, sir.

Q:      – to read?  Do you feel like you have to keep seated all day long, or do you try to get up and exercise some?

**MEMORANDUM DECISION AND ORDER - 15**

A:      I mean, I do some.  I mean, I do a little bit.

Q:      Do you feel like your standing is limited in any way, or that your sitting's limited?

A:      My standing, yes, sir.

Q:      Your standing is?  How much do you – how much of a day do you feel like you could stand?  These aren't trick questions.  I mean –

A:      I knew that.  I mean, I'm just –

Q:      I just want to know.  But a lot of times, probably, you haven't – probably hadn't thought about it.

A:      No, sir.

Q:      And a lot of people don't think about it.

A:      Not a whole lot.  I mean, like I say, I get tired real easy.  And two or three hours a day, probably.

Q:      Two to three hours?  And then, the rest of the time you're sitting down?

A:      Yes, sir.

Q:      So, I get the impression if you're standing that little, you're probably in a situation where you're, kind of, alternating positions quite a bit during the day.

A:      Yes, sir.

Q:      And so, how often do you alternate between sitting and standing during the day?

A:      Five or six times a day.

Q:      About every what, hour or so?

A:      Yeah.  Little more than that.

Q:      Now, the rest time, when you're not sitting or standing, do you walk?  Do you lay down?  Do you recline?  Do you – any of those things?

**MEMORANDUM DECISION AND ORDER - 16**

A:     I lay down.

Q:     Okay.  How much of the day do you lay down, on average?

A:     Most of the day, to be honest.

Q:     Okay.  And do you lay down because you have to or because it's just more comfortable that way?

A:     Because I get tired.

Q:     You get tired.

A:     I take several naps a day.

Q:     Okay.  How much of the day do you think you take a nap?

A:     Probably three or four hours a day.

                                                                . . . .

Q:     You talked earlier about walking two to three – or standing two to three hours per day.  When you said that, were you thinking about the whole day from when you wake up until when you go to sleep?  Or were you thinking about just between 9:00 to 5:00?

A:     The whole day.

Q:     The whole day?

A:     Yes, sir.

Q:     Well, let's confine it to between, you know, the hours of 9:00 to 5:00.  How much time do you actually spend – could you spend two to three hours standing in that eight hour period?

A:     I don't think I can, sir.

Q:     Why could you not do that?

A:     I just get real fatigued.  I mean, I just get wore out.

Q:     Okay.  And from 9:00 to 5:00, how much of that time do you – are you typically spending napping?

A:    Probably four hours or so.  Three to four.

Q:    Okay.  So, most of your naps are in the middle of the day?

A:    Yes, sir.

Q:    Is that what – okay.  Has that been the case since January of 2012?  Has it gotten worse?  About the –

A:    It's gotten worse.

Q:    It's gotten worse?

A:    Yes, sir.

Q:    So, in January of 2012, about how much of that time would you actually spend napping?

A:    About an hour or so.

Q:    An hour or so?  Okay.  When did it get worse?

A:    It's been, kind of, a gradual thing.

Q:    A gradual thing?  There's not a set day or anything.  Is that right?

A:    No sir.

Q:    You mentioned shortness of breath.  Do you get shortness of breath just sitting down like you are today?

A:    Sometimes but most of the time –

Q:    Most of the time –

A:    Most of the time when I do – when I try to do something.

Q:    When you try to do something.  Okay.  About how far can you walk before you have to stop and rest?

A:    About a block.

Q:     About a block?  And how long of a rest period would you need in order to walk another block?

A:     About 10 or 15 minutes.

Q:     Ten or 15 minutes?  Could you remain standing that entire time or would you have to sit down?

A:     I'd rather sit down.

Q:     Rather sit down?

A:     Get my breath.

Q:     And catch your breath?

A:     Yes, sir.

Q:     Okay.  Now, you also mentioned that you have chest pain.  How often do you get the chest pain?

A:     Any time I do anything really strenuous.

Q:     Really strenuous?

A:     Yes, sir.

Q:     Well, what do you consider really strenuous?

A:     Mopping and that kind of stuff.

Q:     Okay.  What about, like doing dishes or sweeping?  Does that cause you chest pain?

A:     Sometimes.

Q:     Okay.  And where – what part of your chest does it hurt?

A:     Mainly, hurts in my arms.

Q:     It hurts in your arms?

A:     Yes.  Yes, sir.

**MEMORANDUM DECISION AND ORDER - 19**

Q:      Okay.  And why does it hurt in your arms?

A:      Just – that's the way the [INAUDIBLE] fixed me.

Q:      Okay.

A:      And in my back.

Q:      All right.  Have you talked to your doctor about that?

A:      Yes, sir.

Q:      And what did he tell you?

A:      Just be part of it.

. . . .

Q:      Okay.  So, your main problem right now is that the fatigue that you experience?

A:      Yes, sir.

Q:      Okay.  And that's related to your heart.  Is that correct?

A:      Yes, sir.

(AR 54-58, 60-63, 65).

Ultimately, the ALJ ruled that Mr. White's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible.  *See* (AR 29).  He did so, in part, because, as discussed above, the objective medical evidence did not parallel Mr. White's subjective complaints.  *See id.* ("The medical evidence does not support the claimant's allegations to the extent alleged."); *see also* (AR 38) ("[Mr. White's testimony regarding his impairments was out of proportion with the objective medical findings.").  That is, the treatment notes from Mr. White's cardiologist, Dr. Hashmi, were never accompanied by a causal connection between Mr. White's more-or-less understood diagnoses

and alleged inability to perform any work-related activities. *See supra*. Here, the ALJ appropriately did not reject Mr. White's complaints that he suffers from heart-related impairments; rather, his focus was on Mr. White's claim that he cannot work in part because those impairments allegedly limit his ability to work. *See, e.g.*, *Madrid v. Colvin*, 2016 WL 1161978, \*10, n.8 (N.D. Cal. 2016) ("The Ninth Circuit has held that 'the adjudicator may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged by the claimant is not supported by objective medical evidence.' As discussed herein, the ALJ did not reject Plaintiff's allegations that she suffers hand pain, but rather evaluated record evidence regarding Plaintiff's alleged diminished dexterity.") (quoting *Bunnell*, 947 F.2d at 346-47). Simply put, there needs to be some "connecting of the dots" via medical evidence in the record on this point; otherwise, as Dr. Reid highlighted (and which the ALJ relied upon in his Decision), the record indicates that, at baseline (after inpatient hospitalization), Mr. White was stabilized and within normal limits. *See supra*.

The ALJ also focused on Mr. White's daily activities, stating in relevant part:

> On January 26, 2012, [Mr. White] told his treating nurse practitioner that he was filing for disability because he was unable to hold down a full-time job. He stated when he tried, he ended up sick or "run down." However, he has reported to much fuller activities of daily living than that to which he testified at the hearing. He reported being able to do laundry, dishes, and light housework. He also reported he goes out every day, drives, shops weekly for 45 minutes, talks with friends, and goes to the store three times a week. He told his therapist on March 29, 2012 that he liked to be "productive" and was working on his house and liked working on old cars. On April 9, 2012, he reported he was staying "really busy" and "getting things done" around the house. I note that not only are such activities as working on old cars inconsistent with the degree of limitation to which the claimant testified, but also that he reported doing such activities prior to his May 15, 2012 catheterization.

(AR 31) (internal citations omitted); *see also* (AR 35) ("The representative further omits what I have discussed throughout this Decision – that [Mr. White] has reported activities of daily living

which are inconsistent with that to which he testified at the hearing.  As I discussed above, he reported that one of his hobbies was working on cars and that he was staying busy cleaning the house.  He claimed at the hearing that he has chest pain when doing some strenuous activities, but often, at baseline, denied either shortness of breath or chest pain."); (AR 37-38) (same).

Finally, the ALJ called into question Mr. White's above-stated testimony concerning his need for (and frequency of) naps, noting in no uncertain terms:

> I note further, that though he told me at the hearing that he naps three to four hours daily, he told Dr. Crittenden less than one month prior to the date Dr. Hashmi completed his interrogatories that he does not take naps.  He had reported on April 9, 2012, over one month prior to the cardiac catheterization, that he was "staying really busy and getting things done around the house."
>
> . . . .
>
> [Mr. White's allegations cannot be accepted as fully credible.  Were [Mr. White's] testimony that he lies down half the day credible, Dr. Hashmi's opinion would be entitled to great, if not controlling weight, and a finding of disability would be appropriate.  However, [Mr. White] told Dr. Crittenden that he does not take naps, and made other prior inconsistent statements that contradict what he told me under oath at the hearing.

(AR 35-36, 38) (internal citations omitted).

Together, these reasons offer clear and convincing explanations as to why the ALJ did not find Mr. White's testimony entirely credible.  Here again, this is not to say that this Court conclusively finds that Mr. White was not disabled under the applicable rules and regulations, or that Mr. White did not suffer from chronic pain.  Indeed, Petitioner identifies conflicting evidence in support of her position.  While such conflicting evidence may not have been given the weight Petitioner would have preferred, the ALJ's decision to doubt Mr. White's credibility in denying disability benefits contains clear and convincing reasons for doing so.  As required by controlling law, the ALJ will not be second-guessed as to such conclusions, on the record here

and the justifications provided.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004) ("[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision.") (internal citations omitted).  Therefore, the Court will not substitute its judgment when the evidence in the record can support the ALJ's findings.

> 3.  The ALJ Reasonably Found That Mr. White's Impairments Did Not Meet or Equal a Listing

At the third step of the sequential process, the ALJ determined that Mr. White did not have an impairment or combination of impairments that meet or medically equal the severity of a listed impairment.  *See* (AR 26-27).  In reaching this conclusion, the ALJ found, in part, that "[t]here is no sign, symptom, or finding relating to [Mr. White's] heart condition sufficient meet any of the requirements of Listing 4.04(A), (B), or (C)."  (AR 26).  Petitioner argues that the ALJ erred in this regard, arguing that, while he discussed Listing 4.04 (ischemic heart disease) at step three of the sequential process, he failed to also consider Listing 4.02 (chronic heart failure). *See* Pet.'s Brief, p. 20 (Docket No. 15) ("White argues the evidence supported a finding he met the requirements of Listing 4.02 for chronic heart failure and the ALJ erred in failing to evaluate the evidence in light of that Listing.").

Listing 4.02 requires that a claimant suffer the severe symptoms listed therein "while on a regimen of prescribed treatment."  20 C.F.R. pt. 404, subpt. P, app. 1 § 4.02; *see also Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for . . . benefits.").  Petitioner identifies instances in the record that she claims support a finding

that Mr. White met the (A) and (B) criteria for Listing 4.02. Respondent counters that the record likewise reflects instances where Mr. White had stopped taking his medications during the relevant time period. *Compare* Pet.'s Brief, p. 21 (Docket No. 15), *with* Resp.'s Brief, p. 15 (Docket No. 20). Specifically, Respondent points out that, in two of the five different episodes of congestive heart failure[4] that Petitioner references, Mr. White was not taking his prescribed medications. *See* Resp.'s Brief, p. 15 (Docket No. 20) (citing (AR 512) (emergency room visit on January 20, 2013: "For some reason, [patient] stopped taking his furosemide [(Lasix)] 40 mg pill daily, will restart."); (AR 465) (March 18, 2013 treatment note: "The patient has been on medications from Dr. Hashmi and the patient has not taken his medications regularly.").

It is true that the ALJ did not consider Listing 4.02. However, any oversight in this regard is harmless in light of the fact that the record confirms that Mr. White had not been diligently taking his prescribed medication during the 12-month period in which Petitioner claims Mr. White experienced the requisite three or more separate episodes of "acute" congestive heart failure. *See Stout v. Comm'r Soc. Sec. Admin.*, 454 F.3d 1040, 1054-55 (9th Cir. 2006) (applying harmless error analysis when ALJ's error "was inconsequential to the ultimate nondisability determination"). Taking such evidence into account, substantial evidence supports a finding that Mr. White does not meet or equal a listing – including Listing 4.02 – because he did not suffer the necessary symptoms "while on a regime of prescribed treatment."

---

[4] Listing 4.02's (B) criteria includes "[t]hree or more separate episodes of acute congestive heart failure within a consecutive 12-month period . . . ." 20 C.F.R. pt. 404, subpt. P, app. 1 § 4.02(B)(2). Respondent does not appear to dispute that these references represent instances of acute congestive heart failure, however, the Court's review of the same calls this finding somewhat into question. *See* (AR 556, 579) (noting only "mild" congestive heart failure). Separately, Respondent does not appear to dispute Petitioner's contemporaneous argument that Listing 4.02's (A) criterion is met. *Compare* Pet.'s Brief, p. 21 (Docket No. 15), *with* Resp.'s Brief, pp. 15-16 (Docket No. 20).

## IV.  CONCLUSION

The ALJ is the fact-finder and is solely responsible for weighing and drawing inferences from facts and determining credibility.  *Allen*, 749 F.2d at 579; *Vincent ex. rel. Vincent*, 739 F.2d at 1394; *Sample*, 694 F.2d at 642.  If the evidence is susceptible to more than one rational interpretation, one of which is the ALJ's, a reviewing court may not substitute its interpretation for that of the ALJ.  *Key*, 754 f.2d at 1549.

The evidence relied upon by the ALJ can reasonably and rationally support the ALJ's well-formed conclusions, despite the fact that such evidence may be susceptible to a different interpretation.  Accordingly, the ALJ's rulings upon Mr. White's disability claim drew upon proper legal standards supported by substantial evidence.  Therefore, the Commissioner's decision that Mr. White is not disabled under the Social Security Act is supported by substantial evidence in the record and is based upon an application of proper legal standards.

The Commissioner's decision is affirmed.

## V.  ORDER

Based on the foregoing, the decision of the Commissioner is AFFIRMED and this action is DISMISSED in its entirety with prejudice.

DATED:  **May 10, 2017**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER - 25**